IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

vs.                                      Case Nos.:  3:13cr34/RV/EMT
                                                    3:16cv659/RV/EMT

JARED LUKE HESTER

---

## <u>REPORT AND RECOMMENDATION</u>

This matter is before the court upon a "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" (ECF No. 427), filed by Defendant Jared Luke Hester.    The Government filed a response (ECF No. 433), and former defense counsel separately filed an affidavit (ECF No. 432).    Defendant Hester has not filed a reply, despite having been afforded an opportunity and time in which to do so (*see* ECF No. 428).    The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.    *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).    After a review of the record and the arguments presented, the undersigned recommends that the § 2255 motion be denied without an evidentiary hearing because Hester's claims are without merit.    *See* Rules 8(a) and (b), Rules Governing Section 2255 Cases.

## BACKGROUND AND PROCEDURAL HISTORY

On April 16, 2013, a grand jury returned a two-count indictment naming eight defendants (ECF No. 3).    Defendant Jared Hester and the other seven co-defendants were charged in Count Two with conspiracy to possess and distribute pseudoephedrine, knowing and having reasonable cause to believe that it would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(2) (ECF No. 3 at 2).    Joseph Peterson was the only defendant also charged in Count One, with conspiracy to manufacture and distribute methamphetamine.    Attorney Christopher Klotz was appointed to represent Hester on April 24, 2013 (ECF No. 54).

Hester proceeded to trial after the remaining co-defendants tendered guilty pleas. Co-defendants Hunter Myrick, Shannon Hurd, and Stephanie Gunderson testified against Hester at his trial (ECF No. 287).    DEA Special Agent Claude Cosey also testified, including about the methamphetamine manufacturing process and how pseudoephedrine is a necessary ingredient, as well as the daily/monthly legal limits on purchasing pseudoephedrine at pharmacies (ECF No. 237, PSR ¶ 54). SA Cosey showed the jury a video of Hester purchasing pseudoephedrine at area pharmacies during the course of the conspiracy (*id*.).    He also showed the jury

certified pharmacy records of Hester's 41 purchases (and attempted purchases) of pseudoephedrine during the course of the conspiracy, and his co-defendants' (approximately) 330 purchases and attempted purchases during the same time frame (*id.*).    SA Cosey presented a summary exhibit demonstrating that Hester and his co-defendants often purchased pseudoephedrine on the same date in the same pharmacy, sometimes within minutes of each other (*id.*).

Cooperating co-defendants Myrick, Hurd, and Gunderson testified that the conspirators, including Hester, purchased pseudoephedrine at area pharmacies and then provided it to Joseph Peterson (who did not testify) or Stephanie Gunderson for use in cooking methamphetamine (ECF No. 237 at ¶ 55).    Each witness testified to having seen Hester provide boxes of pseudoephedrine for this purpose.    Consistent with the records presented by Cosey, the witnesses testified that the conspirators purchased the pseudoephedrine sequentially so as not to arouse suspicion by entering the pharmacy together.    The witnesses also testified that Hester received money in exchange for the pseudoephedrine he provided to the "cooks," and that sometimes he stayed after the exchange to smoke methamphetamine as well (*id.*).

The defense presented the testimony of Phil Wolfe, Ricky Brown, and Bobby Green, who testified that Hester was a good man and a hard worker in the

construction business, and that they never saw or suspected he was using methamphetamine (ECF No. 237, PSR ¶ 56).    Ashlee Hester, Defendant Hester's wife, also testified.    She discussed her extreme allergies and sinus problems for which she took pseudoephedrine daily, and she noted that her husband was allergic to the cats they got in July of 2012 (*id.* at 57). She did not testify as to how she obtained the pseudoephedrine.

Defendant Hester testified in his own behalf (ECF No. 237, PSR ¶ 58; ECF No. 274 at 220, 237–38).    He testified that he never used methamphetamine, and that all of his pseudoephedrine purchases were for him, for his wife, or for co-defendant Peterson's mother.    He testified on cross-examination that the pseudoephedrine purchases made on the same day and sometimes within minutes of his co-defendants' purchases at the same pharmacies were mere coincidences (ECF No. 274 at 228–29).

The jury found Hester guilty of the offense as charged in Count Two of the indictment (ECF No. 157).    The jury was not required to make a quantity determination.

The Presentence Investigation Report ("PSR") attributed 41 purchases and attempted purchases of boxes of pseudoephedrine to Hester, which equated to 92.1

grams of pseudoephedrine (ECF No. 218, PSR ¶ 51).    Hester's base offense level

was 30 because the offense conduct involved at least 70 grams but less than 100

grams of pseudoephedrine.    He received a two-level upward adjustment for

obstruction of justice due to his false testimony at trial, and thus his total offense

level was 32 (ECF No. 218, PSR ¶¶ 63–71).    Hester's criminal history category

was II (PSR ¶¶ 76–78), and the applicable advisory guidelines range was 135 to 168

months (PSR ¶ 114).

    At sentencing, counsel argued that the amount of pseudoephedrine attributed

to Hester was overstated because at least some of the pseudoephedrine Hester

purchased was for his and his wife's legitimate use, although Hester did not testify

to this effect.    The court overruled the objection, but adjusted Hester's offense level

downward by three levels as it had in the co-defendants' cases (ECF No. 261 at 20–

23).    The court overruled counsel's request for a minor role adjustment, after the

Government argued Hester could not be a minor participant because he was not held

accountable for the entire scope of the conspiracy, but only what he had done (*id.* at

23–25).    The adjusted guidelines range was 97 to 121 months.    The court

sentenced Hester at the low end of this range, to a term of 97 months' imprisonment,

noting, among other things, that Mr. Hester had "lost" five levels on his sentence

(i.e., points for acceptance of responsibility were "lost" and points for obstruction were added) due to his decision to go to trial and testify falsely (*id.* at 37).

Hester appealed, challenging a jury instruction, the sufficiency of the evidence to support his conviction, and the calculation of the amount of pseudoephedrine involved in his offense (ECF No. 331).    On May 9, 2014, the Eleventh Circuit affirmed his conviction, but vacated his sentence because the district court did not "make factual findings to support its decision to attribute to Hester all the pseudoephedrine that he purchased" (*id.* at 2).

On remand, the district court imposed the same sentence after hearing testimony from Hester's wife and lengthy argument from counsel (ECF Nos. 356, 352, 353).    The base offense level before any adjustments was 30, but as the court did previously, it reduced that level to 27, noting that level 30 was "excessive" (ECF No. 356 at 40).    The court also noted that if a guidelines-change had "already" reduced Hester's offense level to 28, it would have used that level to determine Hester's advisory guidelines range, rather than level 27 (*id.*).    However, it applied level 27 under the rule of leniency (*id.*)

Hester again appealed.    He argued that most of the pseudoephedrine attributed to him was purchased for lawful use (ECF No. 398).    The Eleventh

Circuit found no clear error in the district court's contrary finding.    It noted that the district court was "entitled to credit the coconspirators' accounts, which were consistent with certified records from seven pharmacies showing that Hester and his coconspirators had made their purchases in tandem" and that the district court reasonably discredited the testimony of Hester's wife about the amount of Sudafed she consumed as inflated (*id.* at 3).

In the present motion, Hester contends that his attorney provided constitutionally ineffective representation at trial and at sentencing.    His claims can be grouped into three basic allegations:    (1) counsel failed to warn Hester that testifying would hurt his sentencing exposure if he was found guilty at trial; (2) counsel failed to investigate two witnesses who were going to either testify falsely or retract incriminating statements against him; and (3) counsel failed to properly present evidence about Ashlee Hester's medical condition either to the jury or to the sentencing court, resulting in prejudice to Hester.

## ANALYSIS

### General Standard of Review

Collateral review is not a substitute for direct appeal, and therefore the grounds for collateral attack on final judgments pursuant to section 2255 are

Case Nos.: 3:13cr34/RV/EMT; 3:16cv659/RV/EMT

extremely limited.    A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack.    *See* 28 U.S.C. § 2255(a); *McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011).    However, "[s]ection 2255 does not provide a remedy for every alleged error in conviction and sentencing." *Spencer v. United States*, 773 F. 3d 1132, 1138 (11th Cir. 2014).

Additionally, the law is well established that a district court need not reconsider issues raised in a section 2255 motion which have been resolved on direct appeal.    *Stoufflet v. United States*, 757 F.3d 1236, 1239 (11th Cir. 2014).    Because a motion to vacate under section 2255 is not a substitute for direct appeal, issues which could have been raised on direct appeal are generally not actionable in a section 2255 motion and will be considered procedurally barred.    *Lynn v. United States*, 365 F.3d 1225, 1234–35 (11th Cir. 2004).

Ineffective assistance of counsel claims generally are not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal.    *Massaro v. United States*, 538 U.S. 500, 503 (2003); *United States v. Campo*, 840 F.3d 1249, 1257 n.5 (11th Cir. 2016).    To

prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Williams v. Taylor*, 529 U.S. 362, 390 (2000); *Darden v. United States*, 708 F.3d 1225, 1228 (11th Cir. 2013). In applying *Strickland*, the court may dispose of an ineffective assistance claim if a defendant fails to carry his burden of showing either deficient performance or prejudice.   *Strickland*, 466 U.S. at 697; *Brown v. United States*, 720 F.3d 1316, 1326 (11th Cir. 2013); *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("[T]he court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances."   *Strickland*, 466 U.S. at 688; *see also Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007).   Reviewing courts are to examine counsel's performance in a highly deferential manner and "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance."   *Hammond v. Hall*, 586 F.3d 1289, 1324 (11th Cir. 2009)

(quoting *Strickland*, 466 U.S. at 689); *see also Chandler v. United States*, 218 F.3d 1305, 1315–16 (11th Cir. 2000) (discussing presumption of reasonableness of counsel's conduct); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted); *Chandler*, 218 F.3d at 1315. "[T]he fact that a particular defense ultimately proved to be unsuccessful [does not] demonstrate ineffectiveness." *Chandler*, 218 F.3d at 1314. When reviewing the performance of an experienced trial counsel, the presumption that counsel's conduct was reasonable is even stronger, because "[e]xperience is due some respect." *Chandler*, 218 F.3d at 1316 n.18.

To establish prejudice, defendant must show that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011)

(quoting *Strickland*).    For the court to focus merely on "outcome determination,"
however, is insufficient; "[t]o set aside a conviction or sentence solely because the
outcome would have been different but for counsel's error may grant the defendant
a windfall to which the law does not entitle him."    *Lockhart v. Fretwell*, 506 U.S.
364, 369–70 (1993); *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 754 (11th Cir.
2010).    A defendant therefore must establish "that counsel's errors were so serious
as to deprive the defendant of a fair trial, a trial whose result is reliable."    *Lockhart*,
506 U.S. at 369 (quoting *Strickland*, 466 U.S. at 687).    Or in the case of alleged
sentencing errors, a defendant must demonstrate that there is a reasonable probability
that, but for counsel's errors, the result of the proceeding would have been less harsh
due to a reduction in the defendant's offense level.    *Glover v. United States*, 531
U.S. 198, 203–04 (2001).    A significant increase in sentence is not required to
establish prejudice, as "any amount of actual jail time has Sixth Amendment
significance."    *Id.* at 203.

The Eleventh Circuit has recognized that given the principles and
presumptions set forth above, "the cases in which habeas petitioners can properly
prevail . . . are few and far between."    *Chandler*, 218 F.3d at 1313.    This is because
the test is not what the best lawyers would have done or even what most good

lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted.    *Dingle*, 480 F.3d at 1099; *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000).    "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'"    *Dingle*, 480 F.3d at 1099 (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)).    The Sixth Circuit has framed the question as not whether counsel was inadequate, but rather whether counsel's performance was so manifestly ineffective that "defeat was snatched from the hands of probable victory."    *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). Regardless of how the standard is framed, under the prevailing case law it is abundantly clear that a moving defendant has a high hurdle to overcome to establish a violation of his constitutional rights based on his attorney's performance.    A defendant's belief that a certain course of action that counsel failed to take might have helped his case does not direct a finding that counsel was *constitutionally ineffective* under the standards set forth above.

Failure to warn of consequences of testifying

Hester's first claim is essentially that Mr. Klotz failed to warn him of the consequences of testifying at trial.    He asserts he told Mr. Klotz that he wanted to testify at trial but counsel never informed or advised him that testifying could affect Hester's sentencing exposure if he was found guilty.    Hester claims if counsel had warned him about the potential obstruction adjustment he would not have testified (ECF No. 427).    Hester states he only learned of the two-level adjustment when he reviewed his PSR (ECF No. 427 at 18).    He asked Mr. Klotz about it, and counsel responded that the points were "almost automatic" if a defendant is "found guilty" and that counsel "forgot to tell him" about the possible adjustment (*id.*)

Hester's suggestion that it was the mere act of testifying that resulted in the two-point adjustment is misguided.    It is the provision of false testimony under oath that results in the application of the adjustment.    The jury's verdict certainly indicates it did not find Hester's testimony proclaiming his innocence to be credible, and the district court concurred.    At sentencing the district court specifically stated the obstruction adjustment was warranted, explaining that its trial notes reflected five separate portions of Hester's testimony that it found to be false (ECF No. 261 at 32–33.)

Finally, Mr. Klotz provided an affidavit in which he avers that his custom and practice is to advise clients about the potential two-point increase in the guidelines level if they testify and are convicted, although he does not independently recall doing so in Hester's case (ECF No. 432-1 at 1).   Counsel discussed the decision regarding whether to testify with Hester over the course of several meetings (*id.*). During these conversations Mr. Klotz emphasized to Hester that he needed to be "100% truthful in his testimony in all regards because the slightest misrepresentation seen by the jury would completely undermine his credibility and likely lead to a jury disregarding his statements of innocence" (*id*. at 2).

Hester did not file a reply, and thus Mr. Klotz's affidavit is unrebutted.   As the Government succinctly notes in its response, Hester "took an oath to tell the truth during his testimony, [and] it is he alone who must face the consequences of violating said oath" (ECF No. 433 at 10).   Hester has not established that counsel's performance was constitutionally deficient under *Strickland*.

Failure to Investigate Inmate Witnesses

Hester's next claim involves counsel's treatment of two potential witnesses, whose testimony Hester contends could have made a difference at his trial, but for counsel's deficient performance.

The first witness, Anthony Pack, was an inmate housed at the Santa Rosa County Jail with Hunter Myrick, one of the Government witnesses and a charged co-conspirator in the case.    According to Hester, Anthony Pack wrote a letter to Hester's wife telling her that Myrick intended to testify against Hester to "get some time knocked off," even though Myrick did not know Hester (ECF No. 427 at 15). Hester states he informed counsel about this, and after their conversation Mr. Klotz assured him he would get in touch with Pack to investigate Myrick's alleged willingness to lie in exchange for a sentence reduction (*id.*).

Myrick testified at trial that he had seen Hester give Joseph Peterson, a methamphetamine "cook," boxes of Sudafed approximately four to six times in exchange for methamphetamine or cash (ECF No. 287 at 63).    On cross-examination, Myrick admitted that once he found out Hester was going to trial and Myrick began to cooperate, he gave law enforcement more information than he had initially provided (*id.* at 67, 74–75).    He asserted that he had seen Hester "quite a few" times at co-defendant Peterson's house (*id*. at 79).    However, any suggestion of total recent fabrication was discredited when on re-direct examination, Myrick affirmed that he had mentioned defendant Hester during his first interview with law enforcement on the date of his arrest, four months before entering a plea (*id*. at 82).

In counsel's unrebutted affidavit submitted in response to Hester's motion, counsel states:

> Hester and I discussed as a matter of trial strategy of not using inmates [sic] alleged jail house statements in Hester's case in chief.   We felt that we would be able to sufficiently show Myrick's bias in cross examination and did not want to have a sideshow of inmates testifying about who said what in jail.   During trial, we revisited the issue and decided that Myrick had sufficiently been discredited and that we would not cloud the water with jailhouse-talk testimony.   We discussed it would become a distraction during Hester's case in chief to call those types of jailhouse witnesses and that we wanted the jury to focus on Hester's testimony and the very positive witnesses we put on in his case in chief.

(ECF No. 432-1 at 4.)

With respect to the second inmate witness at issue in this claim, James Eric Atiabi, Hester also contends that counsel failed to investigate and advise the court that Atiabi had told Hester, in the presence of witnesses, that Atiabi intended to retract his statement implicating Hester in the conspiracy (ECF No. 427 at 4).   The alleged statement occurred in a transport van on the way to court (*id*. at 16).   Atiabi allegedly apologized to Hester for lying about Hester's involvement and said he had lied only because he was upset about a physical fight the two men had engaged in a few weeks earlier (*id*.)   Atiabi said that he would let the Government know that Hester had nothing to do with the conspiracy.   Hester asked the officers driving the

van if they had heard everything and they indicated that they had.   When Hester

was able to speak to Mr. Klotz at the courthouse, he asked Mr. Klotz to call Atiabi

as a witness in his defense.   Mr. Klotz allegedly responded that he did not want to

call a witness wearing prison clothes.   Hester claims that he persisted, arguing that

Atiabi would prove Hester's innocence and call the credibility of the other witnesses

into question, but counsel declined to present his testimony (*id*. at 16–17).

Mr. Klotz states in his affidavit that the decision not to call Mr. Atiabi was

also trial strategy discussed by the two men prior to trial.   Counsel states that he

and Hester agreed if they "started putting on inmates and jail guards to testify

regarding what was allegedly heard in a transportation van, Mr. Hester's overarching

story of innocence to the jury would be diluted by what would become a side issue

of what happened in the van" (ECF No. 432-1 at 3).   Mr. Klotz asserts that the

decision not to call Atiabi was "a conscious decision as a matter of trial strategy not

to cloud the theory of defense with what would amount to a swearing match between

inmates and guards" and that putting Atiabi on the stand would have been "calling a

detrimental witness in our case in chief that had not been called by the Government,"

presumably because of Atiabi's initial implication of Hester in the conspiracy (*id*.).

The defense case focused in large part on Hester's character.   Counsel's decision not to call two inmate witnesses under the circumstances presented in this case was not unreasonable.   Even if the inmate witnesses had been called in an attempt to discredit Myrick (inmate Pack) or otherwise demonstrate Hester's lack of culpability (inmate Atiabi and/or Pack), the evidence still before the jury included the video evidence, pharmacy records, and testimony from two other cooperating witnesses.   Hester has not shown that counsel's performance was constitutionally deficient or that he was prejudiced by what appears to have been a joint strategic decision not to call the inmate witnesses.   *See, e.g., Strickland*, 466 U.S. at 690 (strategic choices of counsel made after thorough investigation of the law and facts relevant to plausible options are "virtually unchallengeable"); *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (calling some witnesses and not others is "the epitome of a strategic decision.").

<u>Failure to properly present evidence as to Mrs. Hester's medical condition</u>

Hester's final claims relate to counsel's alleged failure to provide evidence to the jury and the sentencing court that would have substantiated the defense position that Hester purchased the pseudoephedrine pills for his and his wife's legitimate personal use.   Hester asserts that his wife, Ashlee Hester, had a medical condition

requiring the use (and, therefore, purchase) of pseudoephedrine pills during the time frame of the conspiracy,[1] and that he was also using the pills because he was allergic to a cat they had in their home (ECF No. 427 at 6–7).    He allegedly asked counsel to speak with Ashlee's doctor or to obtain copies of her medical records for trial, but counsel advised him that neither would be necessary since Ashlee herself would be testifying (*id.* at 14–15).

In response, counsel states that he and Hester believed that "Ashlee's testimony concerning her allergies would be very credible and that a medical expert would be cumulative" (ECF No. 432-1 at 4).    At trial, Mrs. Hester's testimony about her sinus issues and Hester's cat allergies was relatively brief (ECF No. 274 at 211–12).    The bulk of her testimony was directed to her husband's character and habits, and the fact that she did not believe him to be a drug user.    Mrs. Hester testified that she had been on pseudoephedrine daily for about seven or eight months, and that the medication had been on her "list of medications from [her] doctors" for six or seven years (*id.* at 211).    She did not testify that her husband purchased pseudoephedrine for her.    In any event, even if the defense had offered the

---

[1] Hester's assertion that counsel could have presented Ashlee Hester's "prescriptions" and "proof that she was not filling her own prescriptions because I was making the purchases for her" is a red herring.  The pseudoephedrine purchases made during the conspiracy were "over the counter" purchases that did not require a prescription.

testimony of a medical doctor, the jury still would have heard the testimony of coconspirators who identified Hester as a member of the conspiracy and a methamphetamine user, and still would have been asked to consider the "coincidence" of multiple purchases of pseudoephedrine made by Hester and various co-defendants in the same day.    As such, Hester has not shown that the outcome of the trial would have been different if such a witness had been called.    Therefore, he has not met his burden of showing counsel was constitutionally ineffective.

Hester asserts that counsel was also ineffective for the same reason at sentencing.    Hester claims that after he reviewed his PSR, he asked counsel to bring in Ashlee's doctor to testify that the pseudoephedrine purchases were made for her medical condition, since "the jury did not believe Ashlee" (ECF No. 427 at 18).    At the original sentencing, counsel offered to have Mrs. Hester testify about the amount of pseudoephedrine purchased for legitimate purposes, but instead proffered that she would have said her husband purchased somewhere between 20 and 30 boxes of Sudafed for their personal use (ECF No. 261 at 13–14).    The court advised defense counsel, "I think one of the strongest pieces of evidence against your client and the one that the jury, obviously, considered, is the fact that Mr. Hester was in the company of several of these co-defendants on each of these purchases.    They were

purchasing it together, clearly, with a full understanding of the purpose and the use for it." (ECF No. 261 at 21). The court's ultimate finding that Hester was responsible for 90.66 grams of pseudoephedrine was overturned on appeal because it had not made express factual findings.

At resentencing after remand Ashley Hester testified that her husband purchased "at least 30 boxes" of Sudafed products for her between January of 2011 and March of 2013 (ECF No. 356 at 5–6).[2] Even if the court had accepted this as true, which it did not (*id*. at 37), neither this testimony nor the testimony of a medical doctor that Mrs. Hester needed to use large quantities of pseudoephedrine would have established her husband's innocence. Government's trial exhibit 12 showed Hester had made or attempted to make approximately 40 purchases during that time period (*id*. at 6), and he had offered no explanation for this during his trial testimony. The court noted that the offense level as originally calculated was well within the guideline range encompassing 70 to 100 grams, and it declined to hold Hester accountable for the coconspirators' purchases, as it could have (*id*. at 37).

---

[2] As noted above, Ashlee Hester did not expressly testify at trial that her husband bought pseudoephedrine for her.

Case Nos.: 3:13cr34/RV/EMT; 3:16cv659/RV/EMT

In sum, Hester has presented no evidence to suggest that medical testimony about Mrs. Hester's use of over-the-counter pseudoephedrine would have altered the result of the either his trial or sentencing.    He has not shown he is entitled to relief.

Conclusion

An evidentiary hearing is not necessary for the resolution of this case because "the motion and files and records conclusively show [Hester] is entitled to no relief." 28 U.S.C. § 2255(b); *Winthrop–Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014).    Moreover, based on the foregoing discussion, the court finds that Hester has not carried his burden of showing that counsel's performance was constitutionally deficient under *Strickland*.    Therefore Hester's motion should be denied in its entirety.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."    A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.    Rule 11(b), Rules Governing Section 2255 Cases.

Case Nos.: 3:13cr34/RV/EMT; 3:16cv659/RV/EMT

After review of the record, the court finds no substantial showing of the denial of a constitutional right.   § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (explaining how to satisfy this showing) (citation omitted).    Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."    If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Based on the foregoing, it is respectfully **RECOMMENDED**:

1.    The Motion to Vacate, Set Aside, or Correct Sentence (ECF No. 427) be **DENIED**.

2.    A certificate of appealability be **DENIED**.

At Pensacola, Florida, this 14th day of May 2019.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.